1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10    RICKEY CARL HUERTA,

11              Petitioner,                    No. CIV S-08-75 WBS CHS P

12         vs.

13    KEN CLARK, et al.,

14              Respondents.        <u>FINDINGS AND RECOMMENDATIONS</u>

15    _____/

16                        I.  INTRODUCTION

17              Petitioner Rickey Carl Huerta is a state prisoner proceeding pro se with an

18    amended petition for writ of habeas corpus brought pursuant to 28 U.S.C. §2254.  In his amended

19    petition, petitioner challenges his convictions entered in the Sacramento County Superior Court

20    for attempted murder and various other offenses, for which he is currently serving a sentence of

21    55 years to life plus 20 years.  Based on a thorough review of the record and applicable law, it

22    will be recommended that the petition be denied.

23                        II.  BACKGROUND

24              The following facts were summarized by the California Court of Appeal, Third

25    District, on direct review.  Petitioner is the defendant referred to therein:

26    /////

**March 14, 2004 (Counts 6 & 7)**

On March 14, 2004, Manjit Singh Sivia was working at Steve's Liquor in the North Highlands area of Sacramento. He heard three or four gunshots, then found the front window broken and glass all over the floor. He did not see who had fired the shots.

Sacramento County Sheriff's Deputy Kevin Mickelson found four shell casings in the parking lot and blood at the store's entry. Eyewitnesses described a truck involved in the shooting; the description fit a truck owned by Virginia Huerta, defendant's wife. Deputy Mickelson contacted her at home and asked permission to search the truck. Seeming agitated, she refused.

After the March 21, 2004, incident recounted below, investigating officers determined that the shell casings and a bullet fragment recovered from Steve's Liquor matched casings found in defendant's home. All had been fired from a .380-caliber handgun found on top of defendant's refrigerator.

**March 21, 2004 (Counts 1-5)**

Defendant, Virginia, and their sons Joseph and Rickey, Jr., lived in North Highlands. Defendant and Virginia had been having marital problems. Defendant had been acting paranoid and talking about suicide. During past arguments, Virginia had threatened to call the police but usually just left to let things settle down. However, she might have called the police a couple of times before March 21, 2004.

On the afternoon of March 21, defendant was barbecuing in the back yard, while Virginia sat in the living room with her son Angelo, who had come for a visit. FN1. She was not helping defendant because she was upset about his use of "street drugs."

> FN1. Virginia testified that an unnamed acquaintance of defendant was with him. She seemed to suggest that this person might have remained at the house and shot at the officers. However, she had not mentioned any such person to the police.

When defendant came in and saw Virginia and Angelo talking, he thought they were whispering about him and began to argue with Virginia. Angelo left. Defendant "smacked" Virginia on top of the head with an open hand, but did not injure her.

Telling him she could not "do it anymore," Virginia went outside to call the police on her cell phone. (She did not recall whether she told him she would call them.) She yelled at him that she wanted a divorce.

2

In her 911 call, which the jury heard, Virginia told the police dispatcher defendant had hit her in the face, but she did not need medical attention. She said he was inside the house after slamming the door, but was not armed. At trial, she testified she did not know there were guns in the house.

Sheriff's deputies responded quickly to the 911 call. Virginia had waited for them outside, while defendant remained inside with Joseph and Rickey, Jr. Defendant had briefly come to the screen door while she stood outside with cell phone in hand. A patrol car was parked on the corner, but she did not think it could be seen from the house.

As the uniformed deputies approached the house, Virginia walked across the front yard to meet them. She told them defendant was acting strangely, probably "tweaking"; he had been awake for four days, drinking and using drugs. She said he had hit her, but was not armed.

Virginia and the deputies walked toward the front porch, with one deputy next to her and the other behind her. One deputy had retrieved a taser from his patrol car's trunk and was holding it to the side.

According to the officer who later interviewed Virginia, she said that as she entered the house she told defendant, "[I]t's the police, just talk to them." At trial, however, she could not recall whether she said that or whether the deputies announced their presence.

The front door was locked. One deputy was still beside Virginia and the other was still behind her as they stood at the door. As she started to open it, she heard gunshots, but did not know where they were coming from or who was shooting. She shouted, "[G]et down" and flung the door open. Seeing her sons running into the back bedroom, she ran after them and lay on top of them on the floor. Seconds later, according to Virginia, defendant, without a gun, joined them in the bedroom as the shooting continued. FN2.

> FN2. After the incident concluded, Virginia discovered that the whole front of the house was shot up.

Virginia called the police outside from the bedroom, telling them that all family members were in the bedroom and defendant did not have a gun on him. She said she thought the guns were in the kitchen. Defendant said he would be willing to walk outside. She told him he was putting her kids in jeopardy.

The two boys walked out of the house at around 4:47 p.m. Virginia and defendant followed at around 5:00 p.m.

Daryl West, who lived across the street, was walking down his driveway at around 5:00 p.m. on March 21. He noticed two sheriff's deputies across the street in full uniform walking up to defendant's front door; both had their guns in their holsters. Hearing gunshots, he ran back into his house. He did not see who fired the shots.

Daryl's son James also saw the two uniformed deputies walking toward the front door with their hands on their holstered guns, Virginia walking a few feet ahead. As they passed a front window and neared the porch, James heard shots.

Another neighbor, Tiffiny Wake, saw Virginia standing in her front yard, then saw the deputies arrive. As the three walked to the front of the house, Tiffiny lost sight of them for a moment, then heard four or five gunshots. Next, she saw the deputies running through her yard with guns drawn. She could not remember seeing anything in the deputies' hands before shots were fired.

In a prior conversation, defendant had told Tiffiny he did not like the police. According to an officer who interviewed her after the incident, she said defendant had told her that if the police ever came for him he would go out in a blaze of glory. At trial, however, she could not recall whether she had said that to the police.

Cliffton Wake, Tiffiny's husband, also saw Virginia and the deputies walking up to the front door. As she opened it, someone appeared to pull her inside. A few seconds later, he heard gunshots coming from inside the house. The deputies did not draw their guns until after the first shots were fired.

Cliffton recalled a conversation with defendant before March 21, 2004, in which defendant claimed the police had followed him home on his birthday; he said they would not take him alive. On another occasion, gunshots fired at defendant's house had woken Cliffton.

Uniformed deputies Matt Tallman and Jamin Martinez arrived at defendant's house in separate patrol cars around 4:30 p.m. on March 21. Deputy Mickelson, who arrived soon after, advised them that defendant might have been involved in a shooting a week before and that Virginia had been agitated and uncooperative when he investigated it. The deputies agreed Mickelson would stay back and cover the others.

When Deputy Tallman spoke to Virginia outside, she was upset and crying, saying defendant had hit her. For officer safety, Tallman requested that she go to the front door and ask defendant to come outside and talk. Windows with blinds flanked the door.

4

The three approached the house, with Tallman beside Virginia and Martinez in the rear. Concerned about the alleged prior shooting, Martinez had gotten his taser, but did not point it toward the house. Neither deputy had his gun drawn.

As they approached, Virginia was screaming at defendant. She opened the door, then disappeared inside. The deputies heard a loud verbal exchange between her and a male. Thinking something was wrong, the deputies stepped toward the front porch. Tallman had not drawn his gun. Martinez, still behind him, had done so, but did not point the gun at the house.

A few seconds later, shots came from the house through the window to the left of the door. Martinez had not seen anyone in the window before the shots were fired. He fired one shot at the door.

Tallman, wounded in the left shoulder, began to fall forward, but returned fire at the window. As he retreated, he was shot in the lower back and yelled out. Deputy Michael Liston, who had arrived as the others were approaching the front door and had heard two separate exchanges of gunfire, grabbed Tallman, put him in Liston's patrol car, and drove him to the hospital. FN3. Meanwhile, as Martinez retreated, something hard and heavy grazed his head but did not hit him.

> FN3. A month later, Tallman had surgery to remove a bullet that had traveled through his shoulder and barely missed his heart. The second bullet that struck him did not penetrate, but left a bruise on his lower back.

Deputy Mickelson headed toward the house when the shooting started. He saw Martinez taking cover. He also saw someone heading from the kitchen through the living room. One front window had glass broken out; the blinds of both were down, with the left window blinds in the open position. FN4. The front door was open.

> FN4. Deputy Brad Rose, who arrived as Deputies Liston and Tallman were leaving for the hospital, saw the left front window blinds open, but they closed moments later. Rose could not see anyone through them.

Defendant was placed in Deputy Rose's patrol car. Before he was taken to the Sheriff's Department, he said, "I hope he comes out okay" and, "I hope his family accepts my apology." Rose thought defendant appeared nervous and excited, but did not show symptoms of being under the influence of narcotics.

Inside the house after the incident, officers found six .380-caliber

casings in the kitchen, a shotgun on the kitchen floor which contained six live rounds, and a .380-caliber handgun on top of the refrigerator. The shotgun had the safety off and a live round in the chamber. The handgun, which smelled as if recently fired, contained a five-round clip with unfired cartridges; it proved to have fired both the recovered .380-caliber shell casings and the bullet removed from Deputy Tallman. A holster and lockbox were found in the back bedroom. FN5. There were holes in the kitchen blinds, suggesting the blinds might have been closed when the shots were fired.

> FN5. According to Virginia, she never saw the handgun before the incident. She had seen the shotgun, but had told defendant to get rid of it and had thought he had done so. She also learned about the holster and the gun lockbox only after the incident.

The officers found two bullets in a truck parked in defendant's driveway and a third bullet in a car parked across the street. All appeared to have been fired from inside defendant's house.

At around 9:25 p.m. on March 21, Deputy Steven Osborne conducted a videotaped interview of defendant at the Sheriff's Department, portions of which were played at trial. Defendant said he was under the influence of drugs as they spoke. He had been on a four-day methamphetamine binge without sleeping. He had consumed two grams of methamphetamine during the binge, including a half-gram on March 21; he had also drunk a 20-ounce malt liquor that day. FN6.

> FN6. A blood sample taken from him after the shooting tested positive for methamphetamine, but did not reveal the amount in his blood.

Defendant admitted he had had a shotgun holding four or five rounds in his garage for six months. He knew that as a convicted felon he was not legally allowed to possess firearms.

On March 14, according to defendant, he shot some dead shells in the air at Steve's Liquor because people nearby had jumped his son, but he was not trying to hit anyone. As he drove up in his truck, one of them started to throw a bottle, so he fired over their heads to scare them; then he saw a window break in the store.

Defendant said at first that he did not remember exactly what happened that afternoon. The incident began, as far as he knew, when he was standing over Virginia. He did not remember getting or firing a gun. He was in the hallway when shots were fired; he could see Virginia and the boys in another room. He did not have a gun in the hallway. He owned a loaded black .25-caliber with a

6

five-round clip and a holster, but he had put it in a closet or a security box, inaccessible to his sons.

Defendant said later that as he stood behind the kitchen counter while Virginia came through the front door, he saw a shadow of a gun. Without aiming or doing anything intentional, he just "popped." He knew Virginia had called 911 and it was the cops: "Who else would come to my house with guns?" Things got out of hand. He just wanted them to go away; he was scared of cops, but would not kill one-he could not kill them all. When they started coming, he shot in their direction, firing four to six shots from either a .25 or a .380. He shot through the window while standing behind the counter. His son did not want him to shoot.

Defendant said he had told Virginia, as if to call her bluff, that if she called the police it would end in a shootout. He reiterated that although he saw only a shadow, he knew it "had to be" the cops because "[n]obody else is going to come to my house brandishing guns and stuff, you know?" Nevertheless, he perceived the shadow as "a threat to me, because there was a big gun and another one right behind him."

Defendant knew he had "fucked up." He said: "[T]hat's giving me a lot of damned time right there, man, you know? Possession of a couple of firearms, hitting a cop. That's attempted murder, man. I'm done. Damn."

**Defense case**

Testifying as a defense witness, Virginia stated she had known defendant for over 20 years and they had been married for 11 years. Recently he had become paranoid as his drug use increased, in particular methamphetamine. It intensified between November 2003 and March 2004, causing missed work, a nervous breakdown, and talk of suicide.

Virginia and defendant frequently argued, and she spoke of divorce. A couple of weeks before March 21, 2004, she had called the police after an argument, but he left before they arrived. Twice he was at home when the police came; nothing violent happened either time.

Defendant had had drug counseling. He began attending Narcotics Anonymous meetings in January 2004, but Virginia went with him only once because she was uncomfortable with the hard-core addicts there; soon after, he stopped going.

Defendant suffered from sleep apnea, which made it hard for him to stay awake during the day. Surgery failed to correct the problem.

Virginia knew that defendant was on a methamphetamine binge for

four days before March 21, 2004, was not sleeping or eating, and was growing more and more paranoid. She knew he had guns but did not know they were inside the house. During the police interview, he looked and sounded as though he were on methamphetamine.

After the house was shot up on a previous occasion, Virginia had bought a video camera, set up the monitor in the master bedroom and directed the camera to the street to show who was coming up to the front of the house; she and defendant usually turned it on at night. She did not know whether it was on on March 21, but thought it was broken. FN7.

> FN7. The parties stipulated, however, that when an officer entered the bedroom on March 21, 2004, he saw the camera turned on, displaying the front yard, driveway, and house.

Defendant's stepson Joseph testified that he came in from the garage around 3:00 p.m. on March 21 and found defendant in the kitchen trying to shoot himself. After Joseph stopped him, defendant said Virginia was outside calling the police; Joseph said she often threatened to do so, but never did. Rickey, Jr., then walked into the living room; defendant followed him and started talking to him. Joseph closed and locked the front door, hoping to put defendant's gun away and to keep Virginia out of the house. Defendant and Rickey, Jr., were still talking in the living room when the front door opened and shots were fired. Joseph had not heard the police presence announced before the shots began and did not see defendant shoot anyone; defendant's gun was still in the kitchen. FN8.

> FN8. Joseph admitted he had not told this story to the police.

Defendant's mother and stepfather testified that when he was three years old, mescaline or LSD coated in chocolate was brought into the home and wound up in his bedroom, where he found it and ate several tabs. He was hospitalized for four or five days. Afterward, his temperament and behavior deteriorated and he struggled in school.

Defendant testified on his own behalf. He remembered the mescaline incident and the discipline problems in school that followed. He also testified to a lifelong problem with sleep apnea, which left him tired all the time.

He started using drugs at 14, beginning with marijuana but moving on to methamphetamine. He began using it heavily at 16 and was soon an addict. It kept him awake. On occasion, he stopped using it.

Four years before his trial, defendant got a job at the Office of State Publishing. He used legal substances, in particular Ephedra and Xenadrine, to stay awake. But after they were taken off the market in mid-2003 he reverted to methamphetamine and soon became heavily addicted again. For eight months before March 21, 2004, he used it daily. Eventually, he started missing work.

On March 21, he had been taking methamphetamine in large quantities for four days without eating or sleeping. That day, he injected it in the afternoon and also smoked a gram. He and Virginia had argued over it.

He had a loaded handgun and shotgun in the water heater closet attached to the garage. He felt he needed them because someone had randomly shot at his house on Thanksgiving.

According to defendant, after he struck Virginia he did not acknowledge her threat to call the police because she had threatened it so often before. However, he felt bad about striking her, which he had not done in a long time. He got his handgun out of the closet to shoot himself, as he had been contemplating for months. The handgun was in a lockbox, which he brought into the bedroom to open with the key. He put the gun to his head but could not fire.

Defendant walked into the kitchen, still holding the gun to his head. Joseph tried to take the gun away. Rickey, Jr., then came in. Defendant put the gun on the counter and picked him up. After Rickey, Jr., went to the bathroom, defendant went to the front door and told Virginia to come back inside. Then he sat down on the couch as Joseph closed the door. After telling defendant that Virginia was not going to call the police, Joseph went to his room.

Defendant went back to the kitchen and grabbed the gun. As he returned to the living room, the front door swung open. He could not see it from his position and did not recognize the sound of the door opening. When he heard it, he turned and looked out the window, where he saw "this big old shadow with a gun"-that is, the shape or outline of a gun. Afraid for his own and his family's safety (though he knew his wife was outside), he shot at the shadow; it all took about a second and a half. He fired only once, but then after hearing more shots he emptied his handgun. He was firing with his eyes closed, not intending to kill anyone. He felt he was defending himself and did not realize he was shooting at the police.

He ran to the garage, got his shotgun, and took the safety off. Back in the kitchen, he looked out the window and saw a police car. Bullets were flying through the house. He dropped the shotgun and lay down on his stomach, then crawled to his family. He was glad the police had come. He had not looked outside or checked the video monitor to see if they were there, and nobody had told him

9

they had arrived.

The deputies put him in a patrol car for six to seven hours as he came down from his high. He had no independent memory of what he said to them, even after watching the videotape of his interview in court. He knew, however, that en route to the station he realized he might have shot an officer. Afterward, he wrote a letter of apology. When he spoke to the police, he was distraught and did not care if he lived or died.

Defendant called his police interview a "bunch of BS" and said he had exaggerated things. He thought the interviewing officer was too aggressive, so he tried to befriend the officer by saying what he thought the officer wanted to hear. He was also lying because he was scared and had not eaten in days; he would have told the officer anything for food. In addition, he was concerned that his family might be accused of involvement in the shooting.

Defendant denied telling his neighbors that he would go out in a blaze of glory confronting the police. He might have said something about going out with a bang when he evaded the police while driving under the influence on his birthday.

Defendant denied the Steve's Liquor shooting. According to him, his handgun was not used in the shooting and the criminalist who testified that it was must have been lying.

Dr. John Wicks, a neurophysiologist who had evaluated defendant psychologically, opined that a number of factors in defendant's history-his mother's drug use during pregnancy, his drug overdose at age three, and his longtime bipolar disorder, sleep apnea, attention deficit hyperactivity disorder (ADHD), and learning disabilities, [ ] could have resulted from the earlier events-inclined him to "self-medicate" with methamphetamine and become an addict.

Methamphetamine is an extremely addictive drug which produces a cycle of highs and lows; eventually the highs become less high and the user keeps taking the drug simply to avoid a crash. It has a stronger effect on someone who is fatigued. Extended use produces paranoia, delusions, and suicidal urges. In the long term it damages the brain, causing a collapse or psychotic breakdown.

Though defendant scored dull normal in verbal IQ and high normal in performance IQ, he was greatly impaired in memory processing, learning efficiency, and visual memory; he also had difficulty taking in and processing information. His disabilities could have made him more vulnerable to emotional problems and hyperactivity from methamphetamine than someone without such disabilities would be.

10

> Dr. Wicks opined that defendant was probably suffering from delusions and hallucinations on the day of the shooting due to his four-day methamphetamine binge without food or sleep. Methamphetamine users often see hallucinatory "shadow people" moving in their peripheral vision, as well as experiencing paranoid delusions; by the time this occurs, everything in their perception is distorted.

> Viewing defendant's police interview, Dr. Wicks believed defendant looked agitated, nervous, and anxious; he was itching and scratching and moving like someone on drugs. However, Dr. Wicks did not see any signs that defendant was hallucinating at that time.

(*People v. Huerta*, No. C050994, slip op. at 3-8 (Cal. Ct. App., Third Dist., Jan. 10, 2007).

Petitioner was convicted by jury of willful, deliberate, and premeditated attempted murder of a peace officer engaged in the performance of duties (Tallman) (Count 1); two counts of assault with a firearm upon a peace officer engaged in the performance of duties (Tallman and Martinez) (Counts 2 and 3); misdemeanor infliction of corporal injury on a spouse, resulting in a traumatic condition (Count 5); discharging a firearm at an occupied building (Count 6); and two counts of possession of a firearm by a convicted felon (one for the March 14, 2004 incident and another for the March 21, 2004 incident) (Counts 4 and 7).

The jury also found as enhancements, with respect to Counts 1 and 2, that petitioner inflicted great bodily injury and intentionally and personally discharged a firearm causing great bodily injury.  As to Counts 2 and 3, the jury found that petitioner used a firearm. As to Count 3, the jury found that petitioner intentionally discharged a firearm and that he personally used a firearm.

In a bifurcated proceeding, the trial court found as enhancements that petitioner had incurred a prior serious felony "strike" under California's habitual criminals or "three strikes" law and that he had served a prior prison term.  The defense moved to strike petitioner's prior convictions; the trial court denied the motion.  Petitioner was sentenced to a determinate term of 20 years plus a consecutive indeterminate term of 55 years to life.

/////

1    The California Court of Appeal, Third District, affirmed petitioner's conviction

2  and sentence on direct appeal, except as to Count 5 (infliction of corporal injury with traumatic

3  condition on his spouse), which the court of appeal reduced to the lesser included offense of

4  battery and remanded to the trial court for re-sentencing.  Thereafter, the California Supreme

5  court denied two petitions for review.

6    Petitioner sought habeas corpus relief in state court.  His petitions to the Superior

7  Court, County of Sacramento, and the Court of Appeal, Third District, were denied.  Petitioner

8  also sought habeas corpus relief in the California Supreme Court, his petition was stricken.

9  Respondent asserts that petitioner failed to exhaust his state court remedies with respect to

10  various claims presented in the amended petition, as set forth in section V, infra.

11                III.  CLAIMS FOR REVIEW

12    In the pending amended petition, petitioner claims that: (A) he was denied his

13  right to effective assistance of counsel at trial (petition, grounds 1-2); (B) the trial court erred in

14  denying his post-trial motion to substitute counsel (petition, ground 2); (C) the trial court erred

15  when it failed to properly assess his mental state at the time he committed the offenses (petition,

16  ground 3); (D) insufficient evidence supported his convictions for Counts 6 and 7 (petition,

17  ground 4); (E) the trial court erred because the jury heard no evidence that petitioner, if

18  convicted, would be subject to a "third strike" sentence of life imprisonment (petition, ground 5);

19  and (F) the trial court made several instructional errors (petition, grounds 6-9).

20          IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

21    An application for writ of habeas corpus by a person in custody under judgment of

22  a state court can be granted only for violations of the Constitution or laws of the United States.

23  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

24  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

25  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

26  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

1   U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

2   AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

3   state court proceedings unless the state court's adjudication of the claim:

4           (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
5           determined by the Supreme Court of the United States; or

6           (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
7           State court proceeding.

8   28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

9   *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

10   V.  EXHAUSTION

11         Before a claim may be properly brought on federal habeas corpus, it must first be

12   fairly presented to the highest court of the applicable state.  28 U.S.C. § 2254(b)(1). In California,

13   that is the California Supreme Court.  *Castille v. Peoples*, 489 U.S. 346 (1989). Here, respondent

14   admits that a portion of petitioner's claim designated (F) herein was properly exhausted, but

15   denies that the remaining portion of claim (F) was exhausted, and further denies that the claims

16   designated (A)-(E) herein were properly exhausted.

17         It is petitioner's burden to show that he has exhausted his state court remedies.

18   *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3rd Cir. 1997), as amended 1998, cert. denied, 532

19   U.S. 919 (2001); *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), cert. denied, 522 U.S.

20   833 (1997); *Olson v. McKune*, 9 F.3d 95, 95 (10th Cir. 1993).  He has not done so with respect to

21   most of the grounds presented in the pending amended petition.  Nevertheless, it will be

22   recommended that habeas corpus relief be denied on the merits, because it is clear that

23   petitioner's claims are not colorable.  *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of

24   habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to

25   exhaust the remedies available in the courts of the State"); *Cassett v. Stewart*, 406 F.3d 614, 624

26   (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on

1    the merits when it is perfectly clear that the claim is not "colorable").

2                        VI.  EXAMINATION OF THE CLAIMS

3          A.      Ineffective Assistance of Counsel

4          The Sixth Amendment guarantees the effective assistance of counsel.  *McMann v.*

5    *Richardson*, 397 U.S. 759, 771 at n.14 (1970).  A showing of ineffective assistance of counsel

6    has two components.  First, a petitioner must show that, considering all the circumstances,

7    counsel's performance fell below an objective standard of reasonableness.  *Strickland v.*

8    *Washington*, 466 U.S. 668, 687-88 (1984).  After the acts or omissions that are alleged not to

9    have been the result of reasonable professional judgment are identified, a reviewing court must

10   determine whether, in light of all the circumstances, those identified acts or omissions were

11   outside the wide range of professionally competent assistance.  *Id*. at 690; *Wiggins v. Smith*, 539

12   U.S. 510, 521 (2003).  In assessing an ineffective assistance of counsel claim, "[t]here is a strong

13   presumption that counsel's performance falls within the 'wide range of professional assistance.'"

14   *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).  In

15   addition, there is a strong presumption that counsel "exercised acceptable professional judgment

16   in all significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing

17   *Strickland*, 466 U.S. at 689).

18          The second factor required for a showing of ineffective assistance of counsel is

19   actual prejudice caused by the deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice

20   is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

21   result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a

22   probability sufficient to undermine confidence in the outcome."  *Id*.; *see also Williams*, 529 U.S.

23   at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

24          Here, petitioner contends that his hired counsel, Mr. Holley, performed deficiently

25   in two ways: (1) he failed to seek discovery of law enforcement personnel records pursuant to

26   *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974); and (2) he failed to request a change of venue

1   for petitioner's trial.  Petitioner also asserts, within this claim, that the trial court erred in denying

2   his post-trial motion to substitute counsel made pursuant to *People v. Marsden*; 2 Cal.3d 118

3   (1970); this allegation will be addressed separately, in subsection B, infra.

4                              1. *Pitchess* Motion

5               Petitioner contends trial counsel should have filed what is commonly referred to

6   in California as a *Pitchess* motion (*Pitchess v. Superior Court*, 11 Cal.3d 531 (1974) (superceded

7   by statute)), requesting the personnel records of law enforcement officers Tallman and Martinez.

8               The privileges and procedures surrounding motions for discovery of peace officer

9   personnel records are now codified in the California Penal Code at sections 832.7 and 832.8 and

10  in the California Evidence Code at sections 1043 through 1045.  A finding of "good cause" for

11  such discovery must be established, including materiality of the information or records sought

12  and reasonable belief that the governmental agency has the type of information or records sought

13  to be disclosed.  Cal. Evid. Code § 1043; *Alford v. Superior Court*, 29 Cal.4th 1033, 1038

14  (2003).  A motion for discovery of peace officer personnel records is addressed to the sound

15  discretion of the trial court.  Id.

16              Here, petitioner contends that Deputies Tallman and Martinez failed to identify

17  themselves as law enforcement officers when they approached his home.  Petitioner alleges that

18  material information, if requested, would have been found in their respective personnel records

19  as follows: "That information being that one occasion prior to Huerta's matter, that deputy's

20  Tallman and Martinez approach a suspect without identifying themselves (sic)."

21              Petitioner offers no support for his allegation that Deputies Tallman and Martinez

22  have on previous occasion(s) failed to identify themselves to suspects as law enforcement

23  officers.  The allegation appears to be purely speculative.  As such, there are no facts to support

24  petitioner's argument that trial counsel should have filed a *Pitchess* motion.  Nor can petitioner

25  show prejudice under these circumstances.  Petitioner's belief that a Pitchess motion might have

26  been successful is insufficient to establish prejudice.  *See Blackledge v. Allison*, 431 U.S. 63, 74

1   (1977) ("presentation of conclusory allegations unsupported by specifics is subject to summary

2   dismissal"); *Jones v. Gomez*, 66 F.3d 119, 204 (9th Cir. 1995) (vague speculation or mere

3   conclusions unsupported by record are not sufficient to state a claim).   Notwithstanding

4   petitioner's self-serving and speculative personal opinion, there is no indication that discovery

5   would have revealed relevant, previous misconduct by Deputies Tallman or Martinez.

6   Accordingly, petitioner is not entitled to relief on this ground.

7                              2.   Change of Venue

8                  Petitioner further claims that his counsel's performance was deficient because

9   counsel failed to request a change of venue for petitioner's trial.   Petitioner argues that it was

10  inconceivable for his attorney to believe that a person accused of attempted murder of a

11  Sacramento County Sheriff's deputy could receive a fair trial in Sacramento county.   Petitioner

12  provides no other facts in support of this allegation.

13                   It is well-established that a criminal defendant has a due process right to be tried

14  by "a panel of impartial, 'indifferent' jurors."   *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).   Under

15  California law, a trial court must order a change of venue for trial of a criminal case to another

16  county on motion of the defendant "when it appears that there is a reasonable likelihood that a

17  fair and impartial trial cannot be held in the county."   Cal. Penal Code §1033(a); *People v.*

18  *Hayes*, 21 Cal.4th 1211, 1250 (1999).   In making a venue determination, the trial court must

19  examine five factors: the gravity of the offense, the nature and extent of the news coverage, the

20  size of the community, the status of the defendant in the community, and the popularity and

21  prominence of the victim.   *See People v. Jennings*, 53 Cal.3d 334, 359-60 (1991).

22                  Here, there is no evidence of any pretrial publicity relative to the charges brought

23  against petitioner.   There is no indication that the size of the community or petitioner's status

24  within the community somehow implicated his right to a fair and impartial trial.   The charged

25  offense was grave and serious and the victims were indeed law enforcement officers, however it

26  is highly unlikely that these factors alone could have tipped the balance of the scale in favor of a

16

1   change of venue.

2           Under these circumstances, petitioner fails to meet either prong of the *Strickland*

3   standard.  It does not appear that a motion for change of venue would have been successful.

4   Moreover, the mere fact that petitioner was charged with attempted murder and other serious

5   offenses against law enforcement officers in the community, without a credible showing of any

6   bias on the part of potential jurors, is insufficient to demonstrate prejudice.  *See Gallego v.*

7   *McDaniel*, 124 F.3d 1065, 1070 (9th Cir. 1997), quoting *United States v. Sherwood*, 98 F.3d 402,

8   410 (9th Cir. 1996) ("To establish actual prejudice, the defendant must demonstrate that the

9   jurors exhibited actual partiality or hostility that could not be laid aside.")  Petitioner has

10  "produced no evidence or argument suggesting that his counsel's failure to defeat venue... had

11  any bearing on the fairness of his trial or was otherwise prejudicial or outcome-determinative."

12  *United States v. Palomba*, 31 F.3d 1456, 1461 (9th Cir. 1994).  Petitioner is not entitled to relief

13  for his attorney's failure to request a change of venue.

14           B.      Denial of Petitioner's Post-Trial Motion to Substitute Counsel

15           Petitioner contends that he had a dispute with his hired counsel which escalated

16  "to the level of an irreconcilable conflict resulting in a total lack of communication."  He claims

17  that the trial court erred in denying his post-trial motion to substitute counsel.

18           On August 2, 2005, after verdict, but prior to sentencing, petitioner made a motion

19  pursuant to *People v. Marsden*, 2 Cal. 3rd 118 (1970).  In a *Marsden* motion, a criminal

20  defendant in California requests that the court discharge his counsel and appoint new counsel.

21  *Id*. at 122-24.  On the same date, petitioner's attorney likewise moved to be relieved as counsel

22  of record.  A transcript of the trial court's hearing on these motions is not part of the record

23  before this court.  Nevertheless, the record clearly reflects that the trial court denied both motions

24  and simultaneously appointed the public defender to represent petitioner for the limited purpose

25  of investigating potential grounds for a motion for a new trial based on ineffective assistance of

26  counsel.  (Clerk's Transcript ("CT") at 7.)  On September 23, 2005, newly appointed counsel for

1    the limited purpose of the new trial motion advised the trial court there were no grounds for a

2    motion for a new trial.  Thereafter, the court granted the request of trial counsel, Mr. Holley, to

3    be relieved as attorney of record and appointed the public defender to continue representing

4    petitioner at judgment and sentencing.  (CT at 8.)

5             The denial of a motion to substitute counsel can implicate a criminal defendant's

6    Sixth Amendment right to counsel and thus is properly considered in federal habeas corpus.

7    *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir.), cert. denied, 513 U.S.

8    947 (1994), overruled on other grounds by *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en

9    banc).  The relevant inquiry is whether the petitioner's Sixth Amendment right to counsel was

10   violated.  *See Schell*, 218 F.3d at 1026 .  The Sixth Amendment guarantees effective assistance of

11   counsel, not a "meaningful relationship" between an accused and his counsel.  *See Morris v.*

12   *Slappy*, 461 U.S. 1, 14 (1983).  A federal court sitting in habeas corpus considers whether the

13   trial court's denial of the motion "actually violated [petitioner's] constitutional rights in that the

14   conflict between [petitioner] and his attorney had become so great that it resulted in a total lack

15   of communication or other significant impediment that resulted in turn in an attorney-client

16   relationship that fell short of that required by the Sixth Amendment."  Id.

17            Under the California standard of *People v. Marsden*, 2 Cal. 3rd 118 (1970), when

18   a defendant asserting inadequate representation seeks to discharge appointed counsel and

19   substitute another attorney, the trial court must permit the defendant to explain the basis of his

20   contention and to relate specific instances of the attorney's inadequate performance.  *People v.*

21   *Memro*, 11 Cal.4th 786, 857 (1995), quoting *People v. Fierro*, 1 Cal.4th 173, 204 (1991); *see*

22   *also Marsden*, 2 Cal.3d at 124-25.  The Ninth Circuit Court of Appeals has held that in assessing

23   a trial court's ruling on a *Marsden* motion in the context of a federal habeas corpus proceeding,

24   the Sixth Amendment requires only "an appropriate inquiry into the grounds of such a motion,

25   and that the matter be resolved on the merits before the case goes forward."  *Schell*, 218 F.3d at

26   1025.

1    Here, petitioner asserts that Mr. Holley should have been relieved immediately

2    after petitioner made his post-trial *Marsden* motion to substitute counsel on August 2, 2005.

3    Petitioner alleges that Holley represented him "in name only" and that he "sat on his hands when

4    it came to defending [petitioner]." Petitioner contends he was "denied his right under state law

5    to fully state his reasons for seeking new counsel." Nonetheless, petitioner also states that upon

6    making his *Marsden* motion, he was allowed "to state the broad grounds for dissatisfaction with

7    counsel, i.e., counsel had done nothing to prepare a defense, refuse[d] to cross examine the

8    People's linchpin witness or try to acquire any impeachable evidence against the People's

9    witnesses."

10    In any event, although petitioner's post-trial *Marsden* motion was initially denied,

11    it is undisputed that the trial court simultaneously appointed the public defender to investigate

12    petitioner's claims regarding counsel's performance for purposes of a new trial motion. The

13    newly appointed attorney from the public defender's office found no grounds for a new trial.

14    Upon receiving this report, the court relieved trial counsel, Mr. Holley anyway, and appointed the

15    public defender to represent petitioner at all subsequent proceedings, including judgment and

16    sentencing. Petitioner thus received what he requested. It is apparent that the trial court made a

17    proper appropriate inquiry into the grounds of petitioner's motion and then resolved the motion

18    on its merits before the case went forward. *Schell*, 218 F.3d at 1025. Petitioner thus received all

19    that is constitutionally required in response to his motion to substitute counsel and there can be

20    no relief for the trial court's alleged error in this regard.

21    C.    Alleged Error with Respect to Petitioner's Mental State

22    Petitioner claims that his conviction must be reversed because "the trial court did

23    not [properly] weigh the circumstances" of his mental state at the time the offense was

24    committed. Petitioner discusses at length the definition of insanity for purposes of a not guilty by

25    reason of insanity plea in California and urges that the testimony of his mother and the defense

26    expert, Dr. Wicks, conclusively showed he suffered from a mental defect due to heavy

19

1 methamphetamine use during the four days preceding his commitment offenses.

2       In California, a defendant charged with a criminal offense may enter one of six

3 possible pleas, including that of not guilty by reason of insanity.  Cal. Penal Code §1016.  Where

4 a defendant enters any plea other than that of not guilty by reason of insanity, he "shall be

5 conclusively presumed to have been sane at the time of the commission of the offense charged..."

6 *Id*.  In this case, petitioner did not enter a plea of not guilty by reason of insanity at any time.  (CT

7 at 4, 83-84; Reporter's Transcript ("RT") at 1-2.)  The issue of petitioner's sanity at the time he

8 committed the charged offenses was not an issue before the trial court or the jury.

9       In any event, the fact that petitioner committed his offenses after a four day

10 methamphetamine binge could not have demonstrated insanity for purposes of such a plea.

11 California law provides that "[i]n any criminal proceeding in which a plea of not guilty by reason

12 of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a

13 personality or adjustment disorder, a seizure disorder, *or an addiction to, or abuse of,*

14 *intoxicating substances.*"  Cal. Penal Code §25.5 (emphasis added); *see also People v. Robinson*,

15 72 Cal. App. 4th 421, 427 (1999) ("[I]f an alcoholic or drug addict attempts to use his problem as

16 an escape hatch, he will find that section 25.5 has shut and bolted the opening.")

17       Thus, the evidence relating to petitioner's drug use would not have supported an

18 insanity defense, had it been entered at trial.  For the same reason, to the extent petitioner might

19 allege that trial counsel should have advised him to plead not guilty by reason of insanity, such a

20 claim would also fail.  Petitioner would not be able to show deficient performance or prejudice.

21 *See Strickland*, 466 U.S. at 687-88, 93-94.  Petitioner is not entitled to relief for his claim that the

22 trial court erred in failing to properly assess his mental state.

23       D.    Sufficiency of the Evidence

24       Petitioner claims that insufficient evidence supported his convictions for

25 discharging a firearm at an occupied building (Count 6) and possession of a firearm by a

26 convicted felon (Count 7), in relation the shots fired on March 14, 2004 that broke the window at

Steve's Liquor.  Petitioner argues that the prosecution failed to adequately prove its case since there were no eyewitnesses and the "evidence presented was circumstantial at best."

On habeas corpus review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  As stated by the United States Court of Appeals for the First Circuit, the focus under Jackson is not the correctness, but rather, the reasonableness of the state judgement. *See Hurtado v. Tucker*, 245 F.3d 7, 19 (1st Cir. 2001).  The dispositive question is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Chein v. Shumsky,* 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).

Under this standard, 'all of the evidence is to be considered in the light most favorable to the prosecution.' *Wright v. West*, 505 U.S. 277, 296 (1992) (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).  The prosecution need not affirmatively rule out every hypothesis except that of guilt.  *Wright*, 505 U.S. at 296.  A reviewing court such as this one must presume- even if it does not affirmatively appear in the record- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.  *Id*.

In order to prove Count 6, the prosecution had to prove beyond a reasonable doubt that petitioner willfully and maliciously discharged a firearm at an occupied building.  *See* Cal. Penal Code §246.  "Willfully" in this context "implies simply a purpose or willingness to commit the act... [and] does not require any intent to violate law." Cal. Penal Code § 7.  "Maliciously" means "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act..." *Id*.

In order to prove Count 7, the prosecution had to prove beyond a reasonable doubt that petitioner had a firearm in his possession or control, after having previously been convicted of a felony offense.  *See* Cal. Penal Code §12021.1(a)(1).  There are two required elements to this offense are that (1) petitioner owned, purchased, or had in his (actual or constructive) possession

1   a firearm or had a firearm under his control; and (2) petitioner had knowledge of the presence of

2   the firearm.  (CT at 145.)

3           At the start of trial, the parties stipulated that petitioner had been previously

4   convicted of a felony offense for purposes of Count 7.  (RT at 2.)  Petitioner's wife, Virginia,

5   testified that they resided together with their children on San Ardo Way in North Highlands,

6   Sacramento.  (RT at 62-63.)  Manjit Singh Silva testified that on March 14, 2004, while working

7   at Steve's Liquor in the North Highlands area of Sacramento, he heard three or four gunshots

8   which shattered the front window of the store.  (RT at 248-49.)  He did not see who fired the

9   shots.  (RT at 250.)

10          Sacramento County Sheriff's Deputy Keven Mickelson found four shell casings in

11  the store's parking lot and blood at the store's entry.  (RT at 221-22.)  Based on investigation

12  leads, Deputy Mickelson contacted Virginia at her home and told her that a vehicle matching the

13  description of hers had been used in a shooting.  He asked for permission to search the truck.

14  Uncooperative and agitated, Virginia refused.  (RT at 223.)

15          On March 21, 2004, Virginia called 911 because of petitioner's drug use and

16  physical abuse.  (RT at 65.)  When sheriff's deputies arrived, Virginia was outside.  Petitioner

17  was inside the residence with the two children.  (RT at 69.)  Virginia told the deputies that

18  petitioner had been up for four days and had been "tweaking."  (RT at 108, 110-11.)  She also

19  indicated petitioner had hit her but that he was not armed with a gun.  (RT at 76.)

20          The front door of the residence was locked.  (RT at 79, 113.)  One deputy was

21  standing next to Virginia while another was behind her.  (RT at 80, 166-67.)  Virginia opened the

22  door and went inside, and the deputies heard somebody talking.  (RT at 169, 193.)  A few

23  seconds later, gunshots were fired through the front window; the deputies returned fire.  (RT at

24  168-69, 193-195.)  Deputy Tallman was shot in the left shoulder and then was shot again in the

25  lower back as he retreated.  (RT at 170-72.)  Deputy Martinez took cover near the garage.  (RT at

26  181.)

1    Inside, Virginia took cover in a bedroom with her two sons.  (RT at 81, 84, 86,

2    116.)  Moments later, petitioner joined them unarmed.  (RT at 86-87.)  Virginia called the

3    deputies on her cell phone and indicated they were all in the back bedroom including petitioner,

4    who did not have a gun.  (RT at 89-90; CT at 318-19.)  Thereafter, Virginia's sons walked out of

5    the house, followed by Virginia and petitioner.  (RT at 98, 213.)

6    Once outside, petitioner was arrested.  During an interview with law enforcement,

7    he stated that he had been standing behind the kitchen counter when he saw shadows of a gun.

8    When his wife came through the front door, he "just popped" even though he knew it was the

9    "cops".  (CT at 347.)  Petitioner was scared of law enforcement and wanted them to go away.  He

10   did not intend to kill a cop, but when they started coming, he shot in their direction four to six

11   times with a .25 or .380 through the window.  (CT at 350-54.)

12   At trial, petitioner testified that he saw a big shadow with a gun which scared him

13   so he started to shoot.  (RT at 539-40.)  He believed he was defending himself.  (RT at 540.)

14   Petitioner had been on a four day methamphetamine binge prior to the shooting.  (RT at 292.)

15   Law enforcement found six .380 caliber bullet casings in petitioner's kitchen and

16   a loaded shotgun on the kitchen counter.  A .380 handgun was found on top of the refrigerator.

17   (RT at 233-38, 325-29.)  The handgun contained a live round and smelled like it had been

18   recently fired.  (RT at 335.)  It was determined that the .380 revolver found in the kitchen fired

19   the recovered .380 shell casings and a bullet removed from the deputy.  (RT at 277-79.)  Three

20   bullets were recovered outside the residence and appeared to have been fired from within the

21   house.  (RT at 324.)

22   Regarding the March 14, 2004 shooting at Steve's Liquor, petitioner told law

23   enforcement he had shot some dead shells in the air because people nearby had jumped his son.

24   He was not trying to hit anyone.  (CT at 360.)  As he drove up in his truck, a bottle was thrown at

25   him, so he fired over their heads to scare them.  As he did, he saw a window break at the store.

26   (CT at 361.)  At trial, petitioner indicated he did not remember this incident.  (RT at 519.)

1    After the incident on March 21, 2004, investigating sheriff's deputies determined

2  that the shell casings and a bullet fragment recovered from the shooting at Steve's Liquor

3  matched the shell casings and a bullet fragment found in petitioner's home.  They had been fired

4  from the .380 caliber handgun found on top of petitioner's refrigerator.  (RT at 272-80.)

5    Viewing this evidence in the light most favorable to the prosecution, a rational

6  trier of fact could have found all the essential elements of Counts 6 and 7 proven beyond a

7  reasonable doubt.  Contrary to petitioner's contention, the circumstantial evidence was sufficient

8  to support the jury's verdict as to both counts.

9    E.    Evidence about the "Three Strikes" Law

10    Petitioner claims that his convictions must be reversed because the jury did not

11  hear evidence that conviction of the charged offenses at trial would constitute his second and

12  third "strikes" under California's habitual criminals or "three strikes" law, and that accordingly,

13  he would be sentenced to a life term of imprisonment.  *See* Cal. Penal Code §667(e)(2)(A).

14    Petitioner was charged by amended information with one prior strike conviction

15  within the meaning of Cal. Penal Code section 667(a).  (CT at 93.)  At trial, he exercised his

16  option to bifurcate the prior strike allegation from the guilt phase of trial.  (RT at 945.)  While the

17  jury deliberated on the issue of guilt, petitioner waived his right to jury trial on the prior strike

18  conviction and admitted that he was previously convicted of attempted robbery in 1993.  (RT at

19  948.)  Petitioner also testified about his robbery conviction during the guilt phase of trial.  (RT at

20  548.)

21    As support for his contention that the jury should have heard evidence relating to

22  his prior strike and its effect on sentencing if convicted, petitioner cites *Apprendi v. New Jersey*,

23  530 U.S. 466 (2000).  Petitioner's reliance on *Apprendi* is misplaced.  In *Apprendi*, the United

24  States Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that

25  increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

26  a jury, and proved beyond a reasonable doubt."  *Id*. at 490 (emphasis added).

1    Contrary to petitioner's argument,  in the trial of a criminal case the trier of fact is

2    not to be concerned with the question of penalty, punishment, or disposition in arriving at a

3    verdict as to guilt or innocence.  As previously stated by the United States Supreme Court,

4        [i]t is well established that when a jury has no sentencing function,
         it should be admonished to "reach its verdict without regard to
5        what sentence might be imposed."  *Rogers v. United States*, 422
         U.S. 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975).  The principle that
6        juries are not to consider the consequences of their verdicts is a
         reflection of the basic division of labor in our legal system between
7        judge and jury.  The jury's function is to find the facts and to
         decide whether, on those facts, the defendant is guilty of the crime
8        charged.  The judge, by contrast, imposes sentence on the
         defendant after the jury has arrived at a guilty verdict.  Information
9        regarding the consequences of a verdict is therefore irrelevant to
         the jury's task.  Moreover, providing jurors sentencing information
10       invites them to ponder matters that are not within their province,
         distracts them from their factfinding responsibilities, and creates a
11       strong possibility of confusion.

12   *Shannon v. United States*, 512 U.S. 573, 579 (1994) (some citations omitted).

13       Petitioner had no right under federal law to place evidence before the jury that he

14   would receive a life sentence if convicted of the charged offenses.  There can be no relief for this

15   claim.

16       F.    Instructional Errors

17       Petitioner claims that the trial court erred when it omitted the following

18   instructions, none of which were requested by defense counsel: (1) an instruction that petitioner

19   would be sentenced under the three strikes law if convicted; (2) a "comparison of burdens"

20   instruction; (3) instructions on the law of self-defense; (4) CALJIC No. 17.10, regarding lesser

21   included offenses; and (5) CALJIC No. 8.72, addressing the distinction between manslaughter

22   and murder.

23       A claim of instructional error does not raise a cognizable federal claim, unless the

24   error "so infected the entire trial that the resulting conviction violates due process." *Estelle v.*

25   *McGuire*, 502 U.S. 62, 71-72, (1991); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977);

26   *Cupp v. Nauhten*, 414 U.S. 141, 146-47 (1973).  "In a criminal trial, the State must prove every

25

element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id*. The issue must be considered in the context of the instructions and the trial record as a whole. *Estelle*, 502 U.S. at 72; *Boyde v. California*, 494 U.S. 370, 378 (1990). The relevant question is whether there is a reasonable likelihood that the jury applied the instructions in a manner that violates the Constitution. *Estelle*, 502 U.S. at 63 (citing *Boyde*, 494 U.S. at 380). Reversal will rarely be justified for failure to give an instruction when no objection was made in the trial court, as with each alleged omission here. *See Henderson v. Kibbe*, 431 U.S. at 154.

### 1.  Three strikes instruction

In the heading of ground six of the amended petition, petitioner states the trial court erred when it failed to instruct the jury "to deliberate on the fact that Huerta is to be convicted under the three strikes law." For the reasons already set forth in subsection F, this claim must fail. Petitioner had no federal right to have the jury so instructed. *See Shannon v. United States*, 512 U.S. 573, 579 (1994).

### 2.  "Comparison of burdens" instruction

In the body of ground six of the amended petition, petitioner asserts that the trial court should have given an instruction on "comparison of burdens" to help the jury distinguish the applicable standard for guilt, proof beyond a reasonable doubt, from other lesser standards. Petitioner appears to assert that such an instruction would have helped the jury understand that the reasonable doubt standard requires more proof than the clear and convincing evidence standard.

The Due Process Clause of the Fourteenth amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). At

trial, petitioner's jury was so instructed:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.
>
> Reasonable doubt is defined as follows: It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

(RT at 811-12.)

Petitioner cites no federal authority, and a thorough search reveals none, demonstrating the existence of any right to have a criminal jury instructed with a "comparison of burdens" instruction explaining that the reasonable doubt standard requires more proof than the clear and convincing evidence standard.  Petitioner is not entitled to relief for this alleged omission.

### 3.  Instructions on self-defense

Petitioner claims that the trial court erred when it failed to instruct, sua sponte, on the law of self-defense.

At trial, petitioner's asserted a defense that he did not know he was shooting at a police officer.  Rather, he was afraid when he thought he saw a large shadow of a person outside his house holding a weapon.  He was afraid and, after the front door opened, shot without thinking.  (RT at 538-40, 596.)  A methamphetamine psychosis expert additionally testified that paranoid delusions are typical after a long term methamphetamine binge during which a person has not slept and that seeing shadows is a common experience for a person under such circumstances.  (RT at 698.)

A lesser and necessarily included offense to attempted murder of a peace officer (as petitioner was charged in Count 1) is attempted voluntary manslaughter based on

27

1  *unreasonable* self-defense.  The jury was so instructed with CALJIC No. 8.41:

2          Every person who unlawfully attempts without malice aforethought
           to kill another human being is guilty of the crime of attempted
3          voluntary manslaughter in violation of Section 664 and 192(a) of
           the Penal Code, a crime.
4
           Voluntary manslaughter is the unlawful killing of a human being
5          without malice aforethought.

6          There is no malice aforethought if the attempted killing of occurred
           in the actual but unreasonable belief in the necessity of defending
7          oneself and/or another person against imminent peril to life or great
           bodily injury.
8
           In order to prove this crime, each of the following elements must
9          be proved:

10         [One, A] direct but ineffectual act was done by one person towards
           killing another human being; and
11
           Two, that person had the specific intent to kill the other person;
12         and

13         Three, the actions taken to kill were unlawful.

14  (RT at 817-18.)

15          At the time of trial, there existed various other jury instructions on *reasonable*

16  self-defense, including CALJIC No. 5.10 (resisting attempt to commit forcible and atrocious

17  crime), CALJIC No. 5.16 (forcible and atrocious crime defined), CALJIC No. 5.42 (resisting

18  intruder on one's property), CALJIC NO. 5.44 (reasonable presumption of fear of death or great

19  bodily injury), and CALJIC No. 5.51 (self-defense -- actual danger not necessary).  The defense

20  did not request and the trial court did not give any of these additional instructions.

21          Petitioner contends that he was denied his right to present a complete defense

22  because, without instruction on "the extent of his right to act in self-defense and how the law

23  views self-defense in general," the jury could not properly determine whether he acted with

24  malice aforethought (for deliberating on the lesser included offense of attempted voluntary

25  manslaughter based on unreasonable self-defense).  Petitioner asserts that the court had a duty to

26  instruct the jury, sua sponte, with instructions on reasonable self-defense.

28

1      On direct review, the California Court of Appeal, Third District, agreed with

2   petitioner's argument that the trial court should have given complete instructions on self-defense.

3   The court of appeal reasoned that a jury could not properly evaluate a defense of unreasonable

4   self-defense, also known as imperfect self-defense, unless it also knew what constituted

5   reasonable self-defense.  Nonetheless, the court of appeal found that the trial court's error was

6   harmless beyond a reasonable doubt.  The court of appeal reasoned that the trial court also had a

7   duty to instruct on circumstances in which the doctrine of unreasonable self-defense was

8   unavailable, and that it was unavailable to petitioner:

9          In *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437 (*Mejia-
           Lenares*) the Court of Appeal for the Fifth Appellate District
10         concluded that imperfect self-defense could not be predicated on
           psychotic delusions.  (*Id*. at p. 1454.)  The *Mejia-Lenares* court
11         reasoned as follows:

12         Imperfect self-defense is a species of mistake of fact. (*Mejia-
           Lenares, supra,* 135 Cal.App.4th at p. 1453; see *In re Christian S.*
13         (1994) 7 Cal.4th 768, 779, fn. 3.) A mistake-of-fact defense to a
           general intent crime under section 26, class Three, cannot be
14         grounded on psychotic delusions. (*Mejia-Linares, supra,* 135
           Cal.App.4th at p. 1454; see also *People v. Castillo* (1987) 193
15         Cal.App.3d 119, 124-145; *People v. Gutierrez* (1986) 180
           Cal.App.3d 1076, 1083.) The analysis does not differ where the
16         crime charged is a specific intent crime. (*Mejia-Linares, supra,* 135
           Cal.App.4th at p. 1454.)

17
           To allow a defendant suffering from "a delusion unsupported by
18         any basis in reality" (*Mejia-Linares, supra,* 135 Cal.App.4th at p.
           1454) to claim imperfect self-defense based on that delusion would
19         "undercut the legislative provisions separating guilt from insanity."
           (*Id.* at pp. 1456-1457.) "When a defendant's belief in the need to
20         use self-defense is based entirely on delusions, the defendant does
           not have a belief based on a reasonable perception of the
21         circumstances. Instead, such a defendant's actions show he or she
           is entirely incapable of reasoning, comprehending, or judging the
22         nature of the situation.... [Citations.] [A]n unreasonable belief [for
           purposes of imperfect self-defense] cannot be based on a psychotic
23         delusion." (*Mejia-Lenares, supra,* 135 Cal.App.4th at p. 1460.)

24         In the instant case, defendant testified that, on the day of the
           incident, he had been taking methamphetamine in large doses for
25         four days without eating or sleeping. Defendant's expert, Dr. John
           Wicks, testified that defendant was probably suffering from
26         delusions and hallucinations on the day of the shooting due to his

29

four-day methamphetamine binge without food or sleep. According to Dr. Wicks, methamphetamine users often see hallucinatory "shadow people" moving in their peripheral vision, as well as experiencing paranoid delusions. If the jury believed the defense evidence, it would conclude that defendant was acting pursuant to paranoid delusions and hallucinations when he shot the police officers. But defendant was not entitled to rely on the doctrine of unreasonable self-defense in these circumstances. (*Mejia-Lenares, supra,* 135 Cal.App.4th at pp. 1453-1454.) The jury should have been instructed accordingly. Thus, in order to apply the doctrine of unreasonable self-defense, the jury would have had to reject the defense evidence, and particularly the testimony of the defendant's expert, Dr. Wicks. This is not a scenario that bodes well for defendant's claim of prejudicial instructional error.

We conclude the trial court's failure to instruct fully on reasonable self-defense was harmless beyond a reasonable doubt.

(*People v. Huerta*, No. C050994, slip op. at 9-10 (Cal. Ct. App., Third Dist., Jan. 10, 2007)).

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479 (1984). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of his case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (it was error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence). This right is limited to situations where "the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009).

As set forth above, the California court of appeal found that imperfect self-defense was not a legally cognizable defense theory for petitioner under California law. Indeed, the California Court of Appeal, Fifth District, has held that "imperfect self-defense remains a species of mistake of fact... as such, it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality." *People v. Mejia-Lenares*, 135 Cal.App.4th 1437, 1453 (5th Dist. 2006). To the extent that a defense theory of imperfect self-defense based on a delusion was not legally cognizable under California law, petitioner was not constitutionally entitled to the given

30

1    instruction on attempted voluntary manslaughter based on an unreasonable belief in the need to

2    defend oneself or another, let alone to any instructions on reasonable self-defense.  *See Hawkins*

3    *v. Horel*, No. C 08-1482, slip op. at 4 (N.D. Cal. Feb. 25, 2010) (criminal defendant in California

4    not constitutionally entitled to imperfect self-defense instruction where such a theory of the case

5    is based solely on a delusion (citing *Mejia-Lenares*, 135 Cal.App.4th at 1453)).[1]

6            In any event, regardless of whether petitioner was actually precluded under

7    California law from asserting an imperfect self-defense theory of the case, the trial court's failure

8    to instruct the jury on reasonable self-defense did not so infect petitioner's trial with unfairness

9    that his resulting convictions violated due process.  Petitioner did not rely on a reasonable self-

10   defense argument at trial.  Rather, he claimed imperfect self-defense based on an actual but

11   unreasonable belief in the need to defend himself.  Even assuming, arguendo, that petitioner was

12   not precluded under California law (by the rule set forth in *Mejia-Lenares*), from relying on a

13   theory of imperfect self-defense, he was not constitutionally entitled to instructions on reasonable

14   self-defense, because the evidence at trial did not support a reasonable self-defense theory of the

15   case.  *See Boulware*, 558 F.3d at 974.

16           In addition, contrary to petitioner's assertion, the given instruction on voluntary

17   manslaughter based on unreasonable self-defense was constitutionally sufficient, in and of itself.

18   The instruction did not leave the jury guessing as to the meaning of "malice aforethought" as

19

20           [1] It is not clear whether the rule set fort hin the holding of *Mejia-Lenares* was well
     established or consistently applied in California at the time of petitioner's trial (or today).  In
21   *People v. Wright*, 35 Cal.4th 964 (2005), the California Supreme Court reversed the holding of
     the California Court of Appeal, Third District, that evidence of a defendant's delusions *could*
22   support a defense theory of imperfect self-defense.  In *Wright*, the California Supreme Court
     specifically left unresolved the question whether imperfect self-defense applied in situations
23   where the defendant's "actual, though unreasonable, belief in the need to defend himself was
     based on delusions and/or hallucinations resulting from mental illness or voluntary intoxication,
24   without any objective circumstances suggestive of a threat."  *Id.* at 966.  Subsequently, as the
     California Court of Appeal reviewing petitioner's conviction explained, in *Mejia-Lenares*, the
25   California Court of Appeal for the Fifth District concluded that imperfect self-defense could not
     be predicated on psychotic delusions.  *Mejia-Lenares*, 135 Cal.App.4th at 1454.  A thorough
26   search reveals no other precedent from the California Supreme Court or the state courts of appeal
     on this issue.

1   petitioner asserts.  Rather, the given instruction explicitly stated that no malice aforethought

2   existed "if the attempted killing of occurred in the actual but unreasonable belief in the necessity

3   of defending oneself and/or another person against imminent peril to life or great bodily injury."

4   (RT at 817.)  Elsewhere, the jury was instructed that the malice aforethought required for a

5   murder conviction is, "namely, a specific intent to kill unlawfully another human being."  (RT at

6   814.)

7          Moreover, no relief can be granted without a showing of actual prejudice.  *Brecht*

8   *v. Abrahamson*, 507 U.S. 619 (1993).  Under *Brecht*, a constitutional error requires reversal only

9   if it "had substantial and injurious effect or influence in determining the jury's verdict."  *Id.* at

10  623.  Here, it is not reasonably likely that the omitted instructions on reasonable self-defense had

11  any effect on the jury's verdict.  The jury rejected petitioner's claim of imperfect self-defense

12  based on an unreasonable belief in the need to defend himself, convicting him instead of willful,

13  deliberate, and premeditated attempted murder of a peace officer in Count 1.  There is no reason

14  to believe the jury would have found differently had it been fully instructed on the law of self-

15  defense, which did not apply to petitioner's case.

16         There was ample evidence at trial that petitioner knew it was police officers

17  approaching his house and that he did not have an actual, albeit, unreasonable, belief in the need

18  to defend himself or others.  Petitioner (supported by the testimony of his wife and stepson at

19  trial) testified he did not know they were police, that he was afraid, and that he would not have

20  fired had he known.  But the contrary evidence was much stronger.

21         Petitioner confessed in custody that he had told his wife if she called the police it

22  would end in a shootout.  (CT at 355.)  He knew his wife had called 911.  (CT at 349.)  Petitioner

23  also repeatedly admitted during the interview that he knew it was law enforcement outside his

24  house, stating, for example, "[w]ho else would come to my house with guns?"  (CT at 349; *see*

25  *also* CT at 356, 357.)  A neighbor testified petitioner had said he "hates cops," and that "he

26  wouldn't be taken alive" if they came for him (RT at 149, 152).  The officers walked up to the

house slowly, in uniform (RT at 54, 75), with no guns drawn; they were not sneaking or

crouching (RT at 57).  Retired detective Crater testified that she had interviewed petitioner's wife

after the shooting at which time petitioner's wife reported that as she entered the house just prior

to the shooting, she said to petitioner, "It's the police, just talk to them."  (RT at 318.)  Finally,

the parties stipulated that Detective Gaverick would testify that "upon entering the master

bedroom to record his observations of the crime scene on San Ardo Way, that the video monitor

that showed the front of the San Ardo home was on and that he could see the front yard of the

residence, the street and part of the driveway."  (RT at 491.)

Petitioner's further allegation made within this ground, that trial counsel Mr.

Holley provided ineffective assistance when he failed to request instructions on self-defense, is

also without merit.  For the same reasons just enumerated, petitioner cannot show prejudice.  *See*

*Strickland*, 466 U.S. at 693-94.  There is no reasonable probability that, but for counsel's alleged

failure, the result of the proceeding would have been different.  Petitioner is not entitled to relief

for the trial court's failure to sua sponte instruct on the law of reasonable self-defense, or for trial

counsel's alleged failure to request such additional instructions.

### 4.  CALJIC No. 17.10

Petitioner contends that the trial court also erred when it failed to instruct the jury,

sua sponte, with CALJIC No. 17.10.  CALJIC No. 17.10 provides specifically, in relevant part:

> If you are not satisfied beyond a reasonable doubt that the
> defendant is guilty of the crime charged, you may nevertheless
> convict [him] [her] of any lesser crime, if you are convinced
> beyond a reasonable doubt that the defendant is guilty of the lesser
> crime...
>
> ...In doing so, you have discretion to choose the order in which you
> evaluate each crime and consider the evidence pertaining to it.
> You may find it productive to consider and reach a tentative
> conclusion on all charges and lesser crimes before reaching any
> final verdict[s].  However, the court cannot accept a guilty verdict
> on a lesser crime unless you have unanimously found the defendant
> not guilty of the [charged] [greater] crime.

(CALJIC No. 17.10.)

1    In the absence of CALJIC No. 17.10, petitioner asserts, the jury was not informed

2 that it could consider the charged crimes and lesser included offenses in any order it chose.

3 Petitioner argues that the trial court's error in omitting this instruction was aggravated when the

4 prosecutor misstated the law during closing argument and defense counsel did not object.

5 Petitioner contends the "prosecutor repeatedly misinformed the jury that it could not even

6 consider the lesser offenses until it rejected guilt of the charged offense." Petitioner refers to the

7 following statements made by the prosecutor in closing argument:

8       A lesser included offense is an offense that's part of the charged
        offense. This is something you can consider that is less than the
9       charged offense, but you only do it if you find him not guilty of the
        charged offense.

10

11      So -- and I'm going to repeat this later because this is so important,
        and the Judge read it to you in the instructions, but it may have
        been hard to catch.

12

13      If you go through on those charges with lesser offenses and find
        him guilty of the charged offense, you never even get to
14      considering the lesser offenses. You do consider the allegations,
        the ones we have already gone through. You do not consider the
        lesser offenses. You don't even touch the verdict forms. You just
15      leave them blank because if you find him guilty of a charged
        offense and then you fill out a verdict form on a lesser offense,
16      you're going to cause all kinds of problems.

17      So please, if you don't come out of this first part of my argument
        with anything else, remember that if you find him guilty of the
18      charged offense, don't even consider the lesser offense.

19 (RT at 841-42.)

20      ...Again, if you find him guilty of the attempted murder, not only
        do you never consider the voluntary manslaughter, you never
21      consider the allegations that go with it.

22 (RT at 843.)

23      I'll repeat it one last time. I think it's the third time. You only
        consider the lesser offenses if you find him not guilty of the greater
24      offense. If you find him guilty of the greater offense, you don't
        even look at the lesser offenses.

25

26 (RT at 846-47.)

On direct review, the California Court of Appeal, Third District, disagreed with petitioner's claim of error:

> We do not think the trial court erred. "[T]he trial court retains discretion to dispense with instructing the jury pursuant to [CALJIC No. 17.10] until such time as a jury deadlock arises. [Citations.]" (*People v. Fields*, supra, 13 Cal.4th at p. 309.) Since no jury deadlock occurred in the instant case, the trial court had no clear, mandatory duty to instruct with CALJIC No. 17.10.
>
> But even assuming the trial court erred in failing to instruct with CALJIC No. 17.10, it is not reasonably probable that a different result would have occurred had the instruction been given. (See *People v. Kurtzman*, supra, 46 Cal.3d at p. 335.)
>
> First, as explained above, the expert testimony did not give defendant a viable claim of imperfect self-defense because psychotic delusions and hallucinations, which Dr. Wicks opined were the basis for defendant's conduct, cannot support imperfect self-defense as a matter of law. (*Mejia-Lenares*, supra, 135 Cal.App.4th at pp. 1453-1460.)  Thus, so far as defendant contends the jury could reasonably have convicted him of the lesser included offense on count 1 (attempted murder of a peace officer) based only on Dr. Wicks's opinion, the contention fails.
>
> Second, we do not see any reasonable likelihood based on any other evidence in the record that the jury, if instructed with CALJIC No. 17.10, would have convicted defendant only of the lesser included offenses on counts 1 through 3. A jury may properly convict a defendant of a lesser included offense only if it finds that all the elements of the lesser offense are satisfied but at least one element of the greater offense is not. For all of these counts, the critical element distinguishing the greater from the lesser offense was defendant's knowledge that the persons he shot at were peace officers performing their duties. Defendant (supported by the testimony of his wife and stepson) testified that he did not know they were and would not have fired had he known. But the contrary evidence was overwhelming.
>
> Defendant confessed in custody that he had told his wife if she called the police it would end in a shootout, he knew she had called 911 anyway, and he knew the persons coming up to his house with guns had to be police officers because no one else would have acted that way. Defendant's wife said to the police after the shootings that she told defendant as she entered the house: "[I]t's the police, just talk to them." The neighbor eyewitnesses testified that the officers were in uniform and easily visible as they approached defendant's door; two of these neighbors also recounted prior conversations in which defendant had said he disliked the police and would go out in a blaze of glory rather than

35

let them take him alive. Finally, the camera and monitor in defendant's bedroom, which gave a clear view of anyone coming to the door, were operating perfectly just after the shootings, according to the officers. It is highly improbable that a rational jury would have rejected all of this evidence and believed defendant's brand-new story instead. FN12

> FN12. Even aside from the facts that defendant's trial account was new, contradicted his prior confession and the overwhelming weight of the evidence, and minimized his guilt, his testimony generally lacked credibility. For instance, he denied shooting at Steve's Liquor, which he had also confessed to the police, although his wife's truck was spotted at the scene and a criminalist opined that defendant's handgun fired the shots. He responded to the latter evidence only by calling the criminalist a liar.

Defendant has shown no basis for reversal on this issue.

(*People v. Huerta*, No. C050994, slip op. at 11-12 (Cal. Ct. App., Third Dist., Jan. 10, 2007)

As the Court of Appeal explained, the trial court retained discretion under California law whether to instruct the jury with CALJIC No. 17.10 unless and until a jury deadlock arose (*see People v. Fields*, 13 Cal.4th 289, 309 (1996)), which did not occur at petitioner's trial. Petitioner cites no clearly established federal law demonstrating that he had a constitutional right to have the jury instructed on the order of their deliberations, and a thorough search reveals none.

In *United States v. Jackson*, 726 F.2d 1466 (1984), the Ninth Circuit Court of Appeals held on direct review of a criminal conviction that it was reversible error for the trial court to have refused a requested defense instruction that the jury could consider the lesser included offense if it was unable, after reasonable effort, to reach a verdict on the greater offense. *Id*. at 1469. In so finding, the Ninth Circuit reasoned:

> As the [United States Supreme] Court said in *Keeble v. United States*, 412 U.S. 205, 212 (1973):
>
> True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense

36

1    instruction- in this context or any other- precisely because he
     should not be exposed to the substantial risk that the jury's practice
2    will diverge from theory.  Where one of the elements of the offense
     charged remains in doubt, but the defendant is plainly guilty of
3    *some* offense, the jury is likely to resolve its doubts in favor of
     conviction (emphasis in original).

4
     The same risk is created by an instruction that the lesser offense
5    cannot be considered unless the jury first agrees unanimously that
     the defendant is not guilty of the greater offense.

6

7    *Jackson*, 726 F.26 at 1470 (emphasis added).

8          In petitioner's case, however, the jury was not instructed that it could not consider

9    the lesser offenses unless and until it first agreed unanimously that he was not guilty of greater

10   offense; rather, it is the absence of an instruction on the order of deliberation of which petitioner

11   complains.  Because an omitted instruction is less likely to be prejudicial than a misstatement of

12   the law, a petitioner seeking habeas relief based on a failure to give a particular instruction bears

13   an especially heavy burden.  *Henderson v. Kibbe,* 431 U.S at 155.  Petitioner has not met his

14   burden, and neither *Jackson* nor *Keeble* advance his claim.

15         Moreover, contrary to petitioner's assertion, the prosecutor's remarks did not

16   misstate the law.  The prosecutor's repeated advisements that the jury need only consider the

17   lesser included offenses if it found petitioner guilty of the greater offenses were consistent with

18   CALJIC No. 17.10, which permits a jury to end deliberation once it unanimously agrees a

19   defendant is guilty of the greater offense (*see People v. Najera*, 138 Cal.App.4th 212, 227

20   (2006)), and consistent with the court's instructions to the jury regarding the verdict forms:

21        You will be given verdict forms encompassing both the charged
          crimes and the lesser included offenses.
22
          Since the lesser included offenses are included in the greater
23        offense, you are instructed that if you find the defendant guilty of
          the greater offense, you should not complete the verdicts on the
24        corresponding lesser offenses and those verdicts should be returned
          to the court unsigned by the foreperson.
25
          If you find the defendant not guilty of the charged crimes, you then
26        need to complete the verdicts on the lesser included offenses by

                                    37

1    determining whether the defendant is guilty or not guilty of the
2    lesser included crimes, and the corresponding verdicts should be
     completed and returned to the Court signed by the foreperson.

3    (RT at 824-25.)

4         Finally, even if this court were to conclude that the trial court's failure to instruct

5    the jury that they could consider the charges in any order somehow impermissibly intruded into

6    the deliberative process, petitioner would still need to show that he suffered actual prejudice. *See*

7    *Brecht*, 507 U.S. at 623.  As set forth *supra*, the evidence of petitioner's guilt of the greater

8    offenses of attempted murder of a peace officer and assault with a firearm upon a peace officer

9    was strong.  The jury was not misinstructed in this case and there is no reason to suspect they

10   would have acquitted petitioner on either of the greater offenses had they received an additional

11   instruction clarifying that they could deliberate on the various offenses in any order.

12        5.  CALJIC No. 8.72

13        Finally, petitioner contends that the trial court erred when it failed to instruct the

14   jurors, sua sponte, with a modified version of CALJIC No. 8.72, which provides:

15        If you are convinced beyond a reasonable doubt and unanimously
          agree that the killing was unlawful, but you unanimously agree that
16        you have a reasonable doubt whether the crime is murder or
          manslaughter, you must give the defendant the benefit of the doubt
17        and find it to be manslaughter rather than murder.

18   CALJIC No. 8.72.  Petitioner contends that, in the absence of this instruction, "his jury had no

19   guidance related to their response to reasonable doubt between the charged and lesser crimes

20   aspect and their obligation to give the defendant the benefit of the doubt."

21        Under California law, when the evidence is sufficient to support a finding of guilt

22   on both a greater and lesser offense, the jury must find the defendant guilty only of the lesser

23   offense.  *See People v. Dewberry*, 51 Cal.2d 548, 555 (1959).  Indeed, such an instruction must

24   be given sua sponte when applicable.  *People v. Aikin*, 19 Cal.App.3d 685, 704 (1971),

25   *disapproved on other grounds* by *People v. Lines*, 13 Cal.3d 500, 514 (1975).

26   /////

38

1    Nevertheless, on direct review, the California Court of Appeal, Third District,

2 held that any error was harmless:

3          Any error in failing to give CALJIC No. 8.72 was harmless under
          the *Watson* standard [for prejudice] for the reasons already stated
4          in part II of the Discussion. There is no likelihood that the jury
          could have found reasonable doubt as to whether defendant
5          committed attempted voluntary manslaughter based on imperfect
          self-defense rather than attempted murder, because to do so it
6          would have had to reject the overwhelming weight of the evidence
          proving that defendant knew he was shooting at police officers
7          who had come in response to his wife's 911 call and posed no
          threat to him. Therefore, the failure to instruct with CALJIC No.
8          8.72 could not have prejudiced defendant.

9 (*People v. Huerta*, No. C050994, slip op. at 12 (Cal. Ct. App., Third Dist., Jan. 10, 2007).

10   The trial court's failure to instruct sua sponte with a modified version of CALJIC

11 8.72 did not so infect petitioner's trial that his resulting conviction violated due process. *Estelle*

12 *v. McGuire*, 502 U.S. at 72-73. A version of CALJIC 8.72 (modified to refer to *attempted*

13 murder and *attempted* manslaughter) would have merely reiterated other instructions that were

14 given. Petitioner's jury was properly instructed on the reasonable doubt standard (see section D,

15 *supra)* and that, "in case of a reasonable doubt whether his guilt is satisfactorily shown, he is

16 entitled to a verdict of not guilty." (RT at 811.) The jury was further instructed, as set forth

17 above, that it should complete the verdicts for lesser included offenses only if it was not satisfied

18 beyond a reasonable doubt that petitioner was guilty of a charged, greater offense. (RT at 824-

19 25.) It must be presumed that the jury followed these instructions, and convicted petitioner of

20 attempted murder of a peace officer only because they unanimously agreed that the prosecution

21 had proved the existence of malice aforethought. *See Greer v. Miller*, 483 U.S. 756, 766 at n.8

22 (1987). Considered in light of all the instructions and the entire trial record, the trial court's

23 omission of CALJIC 8.72 did not create any improper presumptions or lighten the prosecution's

24 burden of proof in such a way as to give rise to a due process violation.

25   Moreover, once again, there is no reasonable likelihood that the trial court's

26 alleged error could have had substantial and injurious effect or influence in determining the

39

jury's verdict. *See Brecht*, 507 U.S. at 623. As the California Court of Appeal stressed throughout its opinion, for the jury to have found petitioner guilty of attempted voluntary manslaughter based on imperfect self-defense rather than attempted murder, it would have had to reject the overwhelming evidence that petitioner knew he was shooting at police officers. There no reasonable likelihood that the jury would have acquitted petitioner of attempted murder of a peace officer had they been instructed with CALJIC 8.72. Petitioner is not entitled to relief for this or any other claim of instructional error.

## VII.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file, petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: July 26, 2010

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE